We will now hear argument in the next case of Nektar Therapeutic Securities Litigation. Steve, is it cocaine? Is that correct? Am I saying it correctly? In the native French, Your Honor, it's cocaine, but cocaine is fine. Okay. Cocaine it is. Very well. And Ms. Wechkin, is that correct? Wechkin, Your Honor. Wechkin. Okay. Very good. Very well. All right. Mr. Cocaine, would you like to proceed? May it please the Court. I'm Alec Cocaine with the law firm of Leviton-Sucharo. I represent the lead plaintiff's appellants in this Securities Clause action. The question at the heart of this appeal is whether the deliberate and undisclosed inclusion of an outlier response in mean data misled the investing public. Common sense and the record below, I think, answer that in the affirmative. The district court erred as to its holdings on falsity, scienter, and loss causation. And on de novo review by this court, those rulings should be reversed. First, as to falsity, the district court incorrectly found that the complaint did not advance facts sufficient to establish that the outlier was included in the 30-fold claim. This holding erred because it ignored new information attributed to CW2 and failed to accept CW2's allegations as true and, importantly, to construe them in a light most favorable to the plaintiffs. But, counsel, if the Nectar had excised the outlier data, wouldn't you be back here on the basis that that had been excised and, therefore, the information was distorted? No, your honor, we believe that excising the data or, at the very least, as we argue in our briefs, presenting the data in a manner that allowed the investing public to understand that a single outlier was influencing the results would have been sufficient to meet Nectar's disclosure obligations to investors. So, no, I don't think we would be back here if that were the case. I want to follow up on that because I want to make sure I understand your argument. Are you making an alternative argument, or are you saying that with the outlier data included, it's a false statement, and so the way that the calculation was done should have been altered? Or are you making the argument that it's fine how they did it to include the outlier, but they should have said that that's what they did? The latter, your honor. It is misleading by omission to fail to disclose that a single outlier was driving the 30-fold claim. So, if that's your argument, then I guess the follow-on is that's why you think that Rigel doesn't apply. It's because you're not saying that the calculation should have been done differently. It's just that the calculation should have been disclosed differently. Yes, your honor, and on the Rigel point, I think that's a very important point here, and I'd like to address it now since you bring it up. Before you go to Rigel, if I can go back to this point, does the complaint in any place explain what the results would have been if you omitted the outlier, patient 14? I know CW, the confidential witness, says it would be nowhere near the 30-fold result. Is there anything in the complaint that tells us what it would have been without the outlier patient? Plagia's expert did not calculate that result, I don't believe, from recollection in the complaint. What we do present, your honor, is final trial data that reflected a difference that was at least 50% smaller than what was initially reported with the 30-fold claim. Following on that, is there anything in the complaint that shows us what 30-times-fold result really means in the real world? I don't know. Looking at the complaint, I'm not sure how good that is. Is 20-fold also very good? Is 10-fold really good, even if it's below that? Yes, your honor. Any increase is good. That's what this drug was designed to achieve. To achieve an increase in CD8 positive effector T-cells, essentially cancer-fighting cells that would invade the tumor microenvironment. Here, that was a key selling point of the drug, so any increase in CD8 positive effector T-cells is a positive, generally speaking. This is a claim repeatedly touted by defendants throughout the class period, saying how important it was to understand that the drug and its method of action were actually working, and that this is a positive, essentially, leading investors to believe that not only is that biomarker important, but it is representative of the drug's efficacy, generally. Would it be still maturely misleading if it was instead of a 30-fold result, if you took out the outlier, it was 25-times-fold? If that were the actual results, removing the outlier, no, I don't think it would be, your honor, because we get into norms of discussing what is an outlier. We refer this court to the Federal Judiciary Central's Manual on Statistical Evidence. That's a source commonly relied on by the judiciary to understand pretty basic scientific concepts. An outlier is simply a data point that's far removed from the bulk of the data, and that is the case here. That's the analysis that plaintiff's expert undertook, analyzing the specific data presented by defendants, and noting that in a 10-patient sample, a 250- to 300-fold increase is an outlier, and to present the data without disclosing the inclusion of that outlier is materially misleading. You mentioned there was a 50-percent reduction, and mentioned actually where in the record is that? That would be in the complaint, your honor, following at the end of the facts section, and I'll just turn to that quickly. Give that to me on rebuttal. You don't have to waste your time on that. Thank you. Give that to me on rebuttal. Just following up on this point of the outlier data is from that one chart that shows five patients. Do we know what the results were with the other patients? Could there have been other patients other than 14 that had significant results? So a number of the patients are identified in figure six, and the complaint explains how those, including patient 14, were included in the 30-fold claim to obtain that 30-fold result. Again, I would direct the court to the section that we were just searching for, which refers to the final clinical trial results that were published by NECTAR in 2019 after the class period, describing the results achieved by the various patients in that study. So is the plain view report, the short sellers report, is that the only thing from the complaint that establishes that the outlier data was part of the 30-fold statement? No, your honor. Critically, we believe standing alone, CW2's allegations firmly established that. And just turning to those, I'd like to read, I think, a critical portion of CW2's testimony that the district court failed to quote when determining that patient 14's data was not included in the 30-fold claim. Specifically, CW2 said that had the outlier patient been removed from the data set, the result would have been nowhere near the 30-fold increase that was demonstrated. And because we know that the 30-fold claim is a measure of CD8 data, we therefore know that patient 14's CD8 data was included in the 30-fold claim. So that establishes the link, your honor. And I would also add, importantly, that under the district court credited CW2's testimony under Zucco, noting that the witness was in a position to know what was recounted. And so I do believe here as well that the court should credit CW2's allegations on that point. The court brought up Rigel, and I'd like to return to that because I do think it's an important issue, which defendants and certainly district court believe was controlling here. We don't believe it is. And I think it's important to situate Rigel in its appropriate context. Specifically, Rigel dealt with a blinded Phase 2 study in which there was a preset protocol and statistical analysis plan. That is not the case here. Here, this was an open-label study in which defendants had the data in hand, as recounted by CW2, had the data in hand before deciding how to present that data. And I think that fact firmly pushes this case outside of Rigel's framework. Moreover, even if the court does believe that the Rigel framework applies, our position is that this is not a reasonable disagreement about statistical methodology. Based on industry norms, the definition of an outlier, plaintiff's expert, CW2, and the guidelines that we believe apply here. On that point, counsel, on that point, why isn't the district court right that you didn't provide enough specificity about the claimed industry standards? I mean, I'm aware that there's other cases, particularly in the accounting context, where there's references to GAAP or, you know, there's a specific reference to a specific source. And here it's pretty vague. It's just industry standard doesn't accept the way this was done. Why is that enough? So I don't think it's just industry standards, Your Honor. We had an expert specifically look at figure six and analyze the patients in the patient data from that chart. And based on that analysis, our expert determined that patient 14 was, in fact, an outlier. I think under common sense, that's true. Under the Osage Tribe case that we cite on appeal, that's also true. It's a measurement that's removed by 2.5 times or more from the mean or 2.5 standard deviations from the mean. Excuse me. I mean, I guess I'm not. Do we take judicial notice in the sense of, you know, everybody knows that a significant deviation in results is an outlier, and it should be taken out for statistical for the statistical answer to be valid. I'm struggling with how do I know what that industry standard is and how do I measure that against it? Because Rigel seems to me to be focused on the courts don't want to get involved when there's this exercise of judgment about science. And we're getting close to that where I'm like, I don't know. I'm not a trained statistician. How am I supposed to make that call? Certainly, Your Honor. You know, that's firstly why we cited the federal judicial center's handbook on statistical evidence. That's an organization that was set up to assist the judiciary with understanding the scientific concepts. We provided definitions from there, which established that this is an outlier and simply something that's far removed from the mean. You know, we think based on common sense, based on that definition, based on a definition embraced by the Supreme Court in the Osage tribe case, we think that it qualifies as an outlier. And based on, importantly, plaintiff's expert's analysis of that data, that it is an outlier. So those are really the reasons that we've identified it as an outlier and don't really believe that there's a reasonable disagreement here. There is a reasonable position, which I think as in the Vertex case that we cite, the district court found that, you know, plaintiff's, sorry, defendant's statements concerning the presence, the data and the presence of outliers were not misleading because that data was presented in a tiered way, a patient stratified manner. Here is a patient that experienced a response of 5% or more. Here are patients that experienced a response of 10% or more. That did not happen here. And we think that is instructive because in that case, the district court found that investors were not misled where the data was presented in a patient stratified way. At the end of the day, our position is that defendants have an obligation to be truthful and transparent with investors in disclosing data. And simply, we think it's misleading to advocate a 30 fold increase when a single patient achieved at least a 250 fold increase in a 10 patient sample. You know, based on that, I reserve the, unless there are further questions, I will reserve the balance of my time. You may do so. Very well. Miss Watkin, let's hear from Nectar Therapeutics, please. Thank you, Your Honor. Robin Watkin on behalf of the defendants. I think the court is rightly focused on Rigel and the issue of falsity, which is which is central here. I want to get to that, but there are two other issues that I think it's very important that we discuss, too. One of them, Mr. Cocan didn't reach, and that's the issue of loss causation. The other is a foundational issue about whether patient 14's figure 6 data were included in the first place. That's something that was discussed, but I think Mr. Cocan is missing a key point and his confidential witness was missing a key point, too. So let me start with that foundational premise first, then hit Rigel, and then talk about loss causation if that is acceptable to the court. So the problem we have, the actual premise of the case, is that all that CW2 says is that patient 14 was included in the 30-fold bar chart. It's not enough to talk about this on a patient by patient level. There are two different tests that are represented by those two different charts. Figure 6 shows the results of immunohistochemistry, which is abbreviated as IHC. That's a specific test where a lab technician counts cells. The 30-fold bar chart shows the results of a different test called flow cytometry. It's reported in different metrics. What plaintiffs are asking the court to infer is that somebody at Nectar took a data point from one chart that's derived from a particular lab test and transplanted it into another chart that reports on different patients who have gotten a different lab test. And there is no basis in plaintiff's complaint to make that leap. CW2 doesn't even acknowledge that there are two different lab tests reflected in the two different charts. There's nothing in the record that shows even that patient 14 had the test that's reflected in the 30-fold bar chart, the flow cytometry test. There's also nothing in the record that suggests that patient 14's results for IHC would be the same as the results for flow cytometry. So, you know, I think plaintiffs have tried to characterize this as a factual dispute, and it's fairer to call this a factual vacuum. Plaintiffs make this assertion about patient 14 being included in the 30-fold bar chart, but that's really meaningless in itself. What's important and what plaintiff's claim is premised on and what the Plainview report was premised on is that this one steep line on figure 6, the outlier, made its way into the 30-fold bar chart, and there are no factual allegations in the complaint that are sufficient to support that. Now, when we get to the Rigel question, we're assuming that the court disagrees with all of that, and the court takes the view that there's a single kind of lab test, and that, in fact, somebody at NACCHO... Before we get into Rigel, I want to go back to the point you're just trying to make. And I understand the point you're making about there's two different tests, and we don't know that this steep line on the one chart is showing up in the 30-fold statement, which is sort of the heart of this case. And maybe the confidential witnesses statement is misleading on that because there's no recognition that there's two tests. How do I balance that with, ultimately, I have to take the allegations in the favor of the plaintiffs at this stage? Yes, there's a heightened requirement, but I have to assume them in the favor of the plaintiffs. How do I reconcile that? They still have to be the relevant allegations, Your Honor, and saying patient 14 was included in the bar chart is not... doesn't get plaintiffs where they need to go. That statement in itself doesn't show that there was any outlier data in the bar chart. If you take CW2 at face value, it still doesn't get the outlier into the bar chart. I mean, the CW2 statement does say that there's outlier data included in the 30-fold statement. I mean, I guess you're right. It doesn't say that the outlier shown in Figure 6 is included in the outlier statement. But there is enough specificity in what CW2 said to say that there's an outlier, whoever that might have been. So if I have to construe that in favor of plaintiffs, I guess I'm back to why isn't that enough? So I think what precisely CW2 says is patient 14, who was an outlier, was included in the bar chart. And I think that is not enough. It's not enough to label patient 14 an outlier without talking about the flow cytometry results, which may or may not have been the same as the IHC results. But I would like to move on to Rigel if that's acceptable, because we don't need to resolve that. If the court regards this as a factual dispute that's inappropriate at this stage, there are three other ways to resolve this case. There's falsity under Rigel, there's scienter, and there's loss causation. So if I could move to Rigel, I think the district court correctly concluded that Rigel is controlling here. I heard an argument from plaintiffs that this is really a falsity state. They're not pleading falsity. They're pleading that the statement was misleading by omission, and therefore Rigel doesn't control. First, I don't think that's supported by the complaint. I think if you look at paragraphs 106 to 108, and then again and again with the similar statements throughout the putative class period, plaintiffs are saying the fraud was to include the purportedly outlying result. But, you know, maybe plaintiffs are now making an argument in the alternative that the court wants to consider, and the argument in the alternative is, okay, you didn't have to leave out the result, but you needed to somehow flag it. And by the way, Judge Forrest, on the question of leaving out the result, I think the court is exactly right. We have to remember that the patient 14 result is not disputed to be accurate. Everybody agrees that it was accurate. What plaintiffs are saying is the company needed to leave out an accurate result. And plaintiffs said if that had been done here, there would have been no complaint. Yes, that's because the result was favorable. But if the rule is you need to leave out outlying results, that means you need to leave out unfavorable outlying results too. And we can be certain that leaving out an outlying result that was unfavorable would absolutely draw a fraud claim. And we don't want to put companies in the quagmire of having to decide when to leave out undisputedly accurate data. As to the idea that, okay, you can leave the data in, but you need to flag that there is a variance among the data points. Rigel speaks to that too. Rigel says that companies have no obligation to choose or disclose alternative methodologies simply because a plaintiff or an expert says that theirs isn't the right one. Rigel's progeny in the Southern District of New York, the Abley case, says companies are not required to regard a result as aberrational simply because somebody else regards it as aberrational. This was a good result. There's no question but that it was a good result. If I may interrupt, maybe Rigel does control here. But the one thing that gives me pause is Rigel involved highly technical issues, you know, p-value, Fisher's method versus some other method. Here, including an outlier seems just much more common sense. So, I mean, just by way of analogy, if an investment advisor tells me that he or she has, you know, over 20 years, 20 percent return, sounds good. And then you look at these specific investments and you see invested in Enron, Blockbuster, MySpace, et cetera, and then had one Amazon stock that performed well. You know, I may think, you know, gee, this investment advisor may have just gotten lucky with Amazon and he or she has, you know, had terrible judgment with respect to everything else. So, in that way, you know, again, maybe Rigel does apply here but does give me a little bit of pause here that we may be extending it too far if we apply it here. Yeah. Well, let me speak to that. I think if we're in the realm of common sense, then we need to look at all of this within the realm of common sense. And that means everything the investors were told, not only the number 30-fold but also the data set. There was an N of 10. Investors knew this was a very small data set and the very materials that appellants have pointed the court to show that it's also common knowledge that with a small data set, variants can have a large impact on a mean. Investors also knew that this was a mean and a mean is not the only relevant statistic. You know, standing out a little further on the context here, this was a biomarker result, an interim biomarker result in a phase one trial. I heard a lot of statements from plaintiffs about how Nectar was selling the drug and representations Nectar made about efficacy. This is nowhere near that. The drug isn't being sold. The drug is still years away from FDA approval at the time the challenge statements are being made. This isn't about efficacy. Efficacy is whether cancer patients are getting better. This is about conceptual indications that the drug may have a mechanism that could help cancer patients. So all of this is part of the context that investors had when they were looking at this 30-fold bar chart. And I'm emphasizing the very early stage not only because it's important to the Rigel and falsity analysis, but also because it's critical to the loss causation analysis. So we have two stock drops here. We have the first drop on June 2nd of 28, or June 4th of 2018, two days after Nectar announces interim clinical trial results at the ASCO conference, which is the preeminent oncology conference in the U.S. These were not biomarker results. These were tumor scan results. These were results about whether patients were beating their cancer. And this was the second such announcement of these results. In November of 2017, Nectar reported very favorable results on tumor scan. In June, the results were a little bit less favorable, and the market had a very large reaction to that stock price. It fell from approximately $90 to approximately $50 a share. That had absolutely nothing to do with the biomarkers, with the phase one proof of concept data. That's what's at issue in the biomarkers. That had to do with efficacy. And, yeah. I'm sorry. The reason that's important is that this court's jurisprudence following the Dura decision from the Supreme Court has this formulation of the very facts. The facts that trigger a stock price drop have to be the very facts that are at issue in the purported fraud. And there's no way that plaintiffs can make that bridge here. The facts on the face of them are distinct. They're about different tests. They're about different metrics. They're even about a different treatment. The PIVOT trial from which the tumor scan data came was a combination treatment where Nectar's drug was combined with another drug. You know, it's also critical to remember what was reported in June of 2018 was interim trial results, as had been in November. And we have a hypothetical in our brief that I think speaks to this. And it's a hypothetical about election returns. If your preferred candidate is up 5% right after the polls close and ends the night 10% down and loses, it doesn't mean the 5% number was wrong or was a fraud. It means the data weren't all in and the data hadn't all been counted. And, you know, even if we had a match of tests and metrics and treatments, plaintiffs would still have that problem with the June 2nd disclosure. It's more interim data. It doesn't show that earlier reporting was false. Then we have the October 1st drop. And this is triggered by plaintiff's short-seller report. Or I shouldn't say it's plaintiff's. It's the short-seller's short-seller report that plaintiffs billed their last compensation case on. And this court's jurisprudence is just very, very clear on this. This court decided the BFI case last year, actually two cases, both involving the same defendant, BFI. And looked carefully, particularly in the first decision, at short-seller reports and when short-seller reports can constitute a corrective disclosure for last compensation purposes. And the court zeroed in on disclaimers, disclaimers about financial interests in particular, also disclaimers about accuracy. And the court said the market knows how to value these disclaimers. And the market looks at disclaimers like this and regards the short-seller's statements with a great deal of skepticism. And given that context, it is not plausible to show that, to allege that a short-seller report constitutes new information sufficient for last compensation purposes. So I think there's really no daylight between this case and BFI on the second loss causation point. And the first loss causation point, again, is controlled by this very fax formulation. So I'll just end by saying again, we have four issues on which the district court ruled to convince this panel that Judge Gilliam got all four of them wrong. I don't believe plaintiffs have done that. Thank you. Very well. Thank you very much. Mr. Kokan, you have a few moments, a few minutes of rebuttal time. Thank you, Your Honor. As to the IHC versus FLOS cytometry difference, you know, this is explained in the briefing. I don't want to belabor it too much, but we believe it's a distinction without difference. Both are measuring CDA, one in absolute numbers, one a relative change in the biomarker. So I'll just leave it at that. I do want to return to Rigel because, you know, there's some interesting discussion of Rigel and whether or not this case falls within Rigel's framework or not. You know, I'd just like to point the court to the Rigel opinion where the court expressed its serious concerns as to how the post hoc decision on how to present data may introduce bias. And there the court says, because there are many ways to statistically analyze data, it is necessary to choose the statistical methodology before seeing the data that is collected during the clinical trial. Otherwise, someone can manipulate the unblinded data to obtain a favorable result. And also in Rigel, factually, the court found that plaintiffs did not allege that defendants had chosen or changed their statistical methodology after seeing the unblinded raw data. No, that's not the case here. According to CW2, it was defendant Robin who ordered the inclusion of patient 14's data in the 30-fold claim. Counsel, since you're pursuing that aspect, I'd like to know what facts in your complaint support a strong inference of scienter here. Certainly, Your Honor, we think that common sense, the plaintiff's expert's testimony, the background norms applicable to the presentation of scientific data and the guidelines we cite, you know, go to defendant's knowledge of what is right and what is wrong. CW2 also says that the presentation of the data in this form was misleading and essentially unscientific and misled the investing public. And you think that meets the scienter requirement? Knowledge and scienter and falsity in this case, Your Honor, are closely intertwined. If you know that something is an outlier, you know that it is then misleading to present data without somehow flagging the presence of outliers. So, yes, we do believe that comes, surpasses the required showing of knowing recklessness or actual knowledge of falsity. So you're more of the knowing recklessness concept, I gather. I do believe we show intentional conduct on the part of defendants knowing falsity. But, you know, recklessness is also part of the standard. I'd like to briefly address lost causation, if the court will permit me. We don't think that this case falls, as with respect to the last disclosure, falls within the BFI framework. I think there are substantial differences in the disclaimer language used in the BFI report. The anonymous, the five anonymous short seller posts in BFI were also highly subject to a lot of conjecture based on third party sources. That isn't the case here. This is the company's very own data that's being analyzed. And under a Gilead and BFI analysis of company data for the first time can constitute a corrective disclosure. I would just say with respect to the first corrective disclosure that we're investors expectations concerning the efficacy of the drug are inflated by false representations concerning its ability to elicit a T cell response. Then that relevant fact is corrected when the market realizes that the drug is not as effective as otherwise intended. Thank you very well. OK, your time is up. Let me ask my colleagues whether either has addition. Hearing none, we thank both counsel for your argument in the case today. It's very helpful. The case of nectar therapeutic securities litigation is here as submitted and the court stands adjourned for the week. We wish you all a good day. Thank you, Your Honor. Thank you.
judges: SMITH, LEE, FORREST